Ronald V. YOUNGMAN, Appellant,

v.

Dan DOERHOFF, Superintendent, and Board of Education, Gasconade County R–1 School District, Respondents.

No. 64758.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 6, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 10, 1995.

Charles R. Oldham, St. Louis, for appellant.

John B. Berkemeyer, Herman, for respondents.

CRAHAN, Judge.

Ronald V. Youngman ("Teacher") appeals his dismissal as a permanent teacher by the Board of Education, Gasconade County R–1 School District ("Board") based on its determination that he had engaged in "immoral conduct." Teacher claims that the Board's determination is based on findings that are not supported by competent and substantial evidence, go beyond the specific

charges which were the subject of the hearing, and do not, as a matter of law, support the ultimate finding of "immoral conduct" as specified in § 168.114.1(2) RSMo 1986.[1] We reverse and remand.

### Procedural History

The charge served upon Teacher was set forth in a letter dated March 22, 1993 from the District Superintendent as follows:

> You, acting as a teacher, at school, during the school day on Tuesday, March 16, 1993 did approach a male student at the Hermann Middle School, hug him, rub his back, and proceed to kiss him. This appears not to be an isolated incident, and appears to be unsolicited.

The Superintendent's letter stated that this incident "could be considered to be abuse and indicates physical or mental condition unfitting of yourself to instruct or associate with children, and/or immoral conduct under the circumstance [sic] of the incidents, as outlined in 168.114 RSMo."[2] The letter stated that Teacher was suspended with pay, instructed him to stay away from the school during regular school hours and advised him of his right to a hearing before the Board.

Teacher made a timely request for a public hearing, which was conducted as provided in § 168.118. Following the hearing, the Board met in closed session at which it adopted findings of fact and conclusions of law culminating in a conclusion that Teacher had engaged in immoral conduct justifying his termination pursuant to § 168.114.1(2).

### Standard of Review

The incidents which gave rise to the charge are two encounters between Teacher and a student, C.C., both of which occurred at school and during school hours. Both Teacher and C.C. testified at the hearing and their versions of both incidents were consistent in all material respects. Teacher does not challenge the factual findings of the Board with respect to what transpired during either encounter. Rather, Teacher maintains that the Board erred in determining that Teacher's actions amounted to "immoral conduct" within the meaning of § 168.114.1(2). Further, Teacher challenges certain additional findings of the Board, which he maintains are beyond the scope of the conduct charged and unsupported by competent and substantial evidence.

■ Because Teacher's challenge is directed primarily to the Board's interpretation and application of the law to the facts, our scope of review is less restricted than in cases involving purely factual disputes. § 536.140.3.[3]; *Lile*, 701 S.W.2d at 504. We may independently weigh the evidence and resolve factual issues, but in so doing we are obliged to give due weight to the opportunity of the agency to observe the witnesses, and

---

1. The circuit court affirmed Teacher's dismissal. We review the findings and decision of the Board rather than the judgment of the circuit court. *Lile v. Hancock Place School District*, 701 S.W.2d 500, 504 (Mo.App.1985).

2. All statutory references are to RSMo 1986 unless otherwise indicated. Section 168.114 provides, in part:

   > **168.114 Board may terminate, grounds for.** –1. An indefinite contract with a permanent teacher shall not be terminated by the board of education of a school district except for one or more of the following causes:
   > (1) Physical or mental condition unfitting him to instruct or associate with children;
   > (2) Immoral conduct;
   > . . . .

   Although the Superintendent's letter appears to charge a violation of both subsections (1) and (2), the Board made no finding that Teacher suffered from any physical or mental condition unfitting

him to instruct or associate with children and based its determination solely on § 168.114.1(2). Nor, in our view, was there any competent and substantial evidence to support a finding under subsection (1). Accordingly, we will limit our discussion to the Board's finding of "immoral conduct" as set forth in § 116.114.1(2).

3. Section 536.140.3. provides:

   > 3. Whenever the action of the agency being reviewed does not involve the exercise by the agency of administrative discretion in the light of the facts, but involves only the application by the agency of the law to the facts, the court may weigh the evidence for itself and determine the facts accordingly. The law applied by the agency as aforesaid may include the agency's own rules. In making such determination the court shall give due weight to the opportunity of the agency to observe the witnesses, and to the expertness and experience of the particular agency.

to the expertness and experience of the particular agency. *Id.*

### Summary of the Evidence

The evidence discloses that at the time of the incidents in question, C.C. was a fourteen year old, eighth grade student at the middle school in Hermann, Missouri. C.C. began attending the school in November, 1992. C.C. had been previously diagnosed with a conduct or behavior disorder and was receiving counseling at the school for disciplinary problems. C.C.'s student file reflects a history of physical abuse by his father and periods of foster care. In Hermann, C.C. was living with his mother and brother but apparently had difficulty in bonding with his family. Although living with his mother, C.C. was also under the supervision of the juvenile authorities. Regular meetings were held between C.C.'s mother, juvenile authorities and school administrative and guidance personnel to discuss C.C.'s disciplinary problems.

Teacher has taught language arts for more than twenty years and had been at the Hermann Middle School teaching seventh and eighth grade students for nearly fifteen years. Colleagues testified that he was one of the most popular teachers at the middle school.

C.C. was a student in Teacher's language arts class. Although Teacher was aware that C.C. was receiving counseling for his disciplinary problems, he was neither directly involved in evaluation or treatment of these problems nor informed of the exact nature of C.C.'s condition.

At about noon on March 16, 1993, C.C. was walking down a hall near the cafeteria as Teacher emerged from the cafeteria. C.C. had been to the office because he wasn't feeling well.[4] Teacher asked C.C. what was wrong and he replied that he "wasn't feeling good." According to C.C., Teacher said "Me either" and then said "Well, [C.C.], give me a hug." Teacher then hugged C.C. and rubbed his lower back. According to C.C., he just stood there and did not respond to Teacher's hug. As Teacher hugged him, Teacher kissed him twice on the neck. Then Teacher said "It's okay, [C.C.], because we're going to get through this together." Teacher then left and C.C. went to lunch. Teacher's version of the incident differed only slightly from C.C.'s. Teacher stated that the incident occurred in a hallway nearer the classroom, that C.C. was teary-eyed and that Teacher had asked if C.C. wanted a hug before he did so.

C.C. testified that he was "shocked" and that Teacher's behavior made him "very uncomfortable" because "nobody that's even close to me like relatives or anything would kiss me on the neck." C.C. felt as if Teacher was "making a pass."

After lunch, C.C. went to Teacher and got permission to go back to the office because he still wasn't feeling well. The guidance counselor took him home. C.C. did not attend school the next day because he went to St. Louis for some previously scheduled testing.

The following day, March 18, 1993, C.C. saw the principal, Mr. Combs, before school and asked him if he could go to in-school suspension (ISS). As part of the individualized program for dealing with C.C.'s behavior problems, C.C. was permitted to go to the ISS room whenever he felt he was having problems. Later in the day, Mr. Combs asked C.C. why he wanted to be in ISS that day. C.C. said it was because he didn't want to go to Teacher's class. Mr. Combs suggested there were other ways they might have worked around that and then asked why C.C. didn't want to be in Teacher's class. C.C. replied that Teacher had hugged him and kissed him and related what had transpired on March 16.

Mr. Combs took C.C. to his office and admonished him that the matter was extremely serious and he should be very careful about what he said because there could be serious consequences and ramifications. Mr. Combs then had C.C. repeat the story. Mr. Combs then summoned Mr. Hamlett, the

---

4. Although the cause of C.C.'s distress was not established at the hearing, C.C. testified that he was taking medication to help him in controlling his behavioral problem and the medication had recently been changed.

guidance counselor, and had C.C. relate the story again.

After sending C.C. from the room, Mr. Combs and Mr. Hamlett discussed the incident and decided to summon Mr. Doerhoff, the Superintendent of Schools for the district. When Mr. Doerhoff arrived, Mr. Combs had C.C. again relate what happened. Mr. Doerhoff asked C.C. to write it down and he did so. After conferring, Mr. Combs and Mr. Doerhoff decided they should talk with Teacher about the incident immediately after school.

At approximately 3:30 p.m. on the afternoon of March 18, Mr. Combs and Mr. Doerhoff met with Teacher in his classroom. Mr. Doerhoff told Teacher that a student, whom he did not name, had accused Teacher of approaching him in the hallway and hugging and kissing him. Teacher immediately recalled the situation, naming C.C. and the time and place of the incident. Mr. Doerhoff asked Teacher if it was an isolated occurrence and he replied that he had treated students that way repeatedly over his fifteen years at the school. Mr. Doerhoff asked if this was the only time he had treated C.C. that way and Teacher recalled that there had been at least one other occasion about two weeks prior to the incident in question. Mr. Doerhoff did not inquire into the details of the prior incident.

Mr. Doerhoff suggested to Teacher that his conduct toward C.C. could be misinterpreted and that C.C. did not perceive it as a friendly gesture. Teacher said that it certainly wasn't anything sexual and, according to Mr. Doerhoff, no one suggested that it was. Mr. Doerhoff instructed Teacher to refrain from any other physical contact with students and he agreed to do so.

On the following Monday, Mr. Doerhoff met with Teacher and delivered the letter described above, notifying him of the charges and suspending him from his teaching duties. No further discussion of the charges occurred at this meeting.

In his discussions with Messrs. Combs, Hamlett and Doerhoff, C.C. had not mentioned the prior incident mentioned by Teacher. So far as can be determined from the record before us, the first time C.C. was asked about the details of the prior incident was in a conversation with the Board's attorney prior to the hearing. On direct examination, C.C. testified that approximately two weeks prior to the March 16th incident, Teacher approached him as he was getting some books from his locker while the other students were in class. Teacher asked what he was doing and C.C. said, "Nothing, just getting stuff out of my locker." According to C.C., Teacher said, "Oh," gave him a hug, and kissed him on the forehead. C.C. testified that he was not upset by the incident and felt that Teacher was just being caring and concerned. Nevertheless, C.C. testified that he reported the incident to Ms. Grannemann, his "LBD" teacher, on the day it occurred and told her that "if he ever tried it again, that I would do something about it." C.C. did not know if Ms. Grannemann reported the incident to anyone. C.C. felt that she may not have believed him.

Ms. Grannemann did not testify at the hearing and there is no indication that the details of the first incident were ever communicated to Mr. Combs or Mr. Doerhoff. Nor was there any evidence that Teacher was ever apprised of C.C.'s complaint to Ms. Grannemann about the first incident. Teacher testified that he was never so apprised. The charge that the March 16 incident "appears not to be an isolated incident" was based solely upon Teacher's statement to Messrs. Combs and Doerhoff on March 18 that he had treated students in the same way throughout his 15 years at the school and specifically recalled a similar encounter with C.C. about two weeks prior to March 16.

Mr. Combs testified that during his tenure as principal he had not received any complaints about Teacher prior to the March 16 incident. Although he did not think that kissing an eighth grade male student would generally be an appropriate gesture, he could not rule out situations or circumstances in which it might be appropriate. Mr. Combs testified that he was unaware of other teachers hugging or kissing students at the middle school.

Mr. Doerhoff testified that it was his decision to suspend Teacher, based on his inter-

pretation that kissing a student at the middle school level was "completely inappropriate" for a teacher at school. Mr. Doerhoff further testified that hugging and kissing were not similar in his view. However, Mr. Doerhoff also testified that he did not consider hugging a student to be immoral conduct, nor did he believe that kissing a child was always an immoral act. Other than instructing Teacher to refrain from any physical contact with students at the conclusion of their meeting on March 18, Mr. Doerhoff had not issued any directives about physical contact between teachers and students at the middle school. Mr. Doerhoff was not aware of any other instances of teachers hugging students at the middle school.

Teacher and his brother testified that their family was a very physically demonstrative one which typically engaged in a great deal of hugging and kissing among males and females, children and adults alike. Teacher testified that, throughout his career he had occasionally put his hand on children's backs, patted their heads or hugged them. He said that when there was a great deal of sadness or children were upset, he might hug them or give them a peck on the cheek. He had no idea how many children he may have hugged or kissed over the course of his career. He engaged in such behavior only in an effort to comfort or assist the children and had never been advised that any children found his conduct offensive. Teacher also testified that prior principals had been aware he hugged children and that it had been encouraged.

Several of Teacher's colleagues testified that they had observed Teacher to be a physically demonstrative person and that it was not unusual to see him touching or putting his arm around students. None had observed him engage in any behavior they considered inappropriate. Several of the teachers testified that they, too, hugged children and observed other teachers do so. Two teachers testified that physical contact with students had been expressly encouraged at training sessions. One specifically recalled a slogan used in the training as, "It may be the only hug that child gets that day." Another recalled a speaker posing the question "Have you hugged a child or touched a child today?" Yet another teacher testified that during his evaluation, he was told he needed to work on a more positive attitude, accompanied by the observation that he "had never been seen with my arm around a student."

A classmate of C.C.'s testified concerning an incident in which C.C. had lost his temper due to a misunderstanding over some missing baseball cards. The classmate was upset and crying and Teacher comforted and reassured him with a hug. The student found the gesture comforting and said it relieved him. He did not feel threatened by Teacher's actions and had never witnessed him make any improper approaches to himself or anyone else. The student had also observed other teachers hug children on occasion.

Teacher testified that he hugged and kissed C.C. on March 16 in an effort to comfort him. According to Teacher, C.C. was teary-eyed and in obvious distress. Teacher had no indication that C.C. was offended by his actions. Had he been informed of C.C.'s reaction to the prior incident, he would have refrained from hugging him.

Teacher testified that he had never received any directions not to hug students at the middle school level. In fact, the principal, Mr. Combs, had told the teachers that he would rather have the middle school more like the elementary school when it came to responding to children. Teacher knew C.C. had a disciplinary problem but was never fully informed about his condition. Teacher indicated that he would be better able to assess what might make a child uncomfortable if he had access to such information. Teacher had never been advised of any district policy with regard to physical contact with students or that anyone felt his conduct was inappropriate. Teacher indicated his willingness to abide by district policy should he be informed of it.

Board's attorney also offered copies of C.C.'s and Teacher's school and district files, which were received under seal. Teacher did not object to the receipt of C.C.'s files or the written evaluations of Teacher contained in his files but objected to admission of the

balance of his files on the ground that any materials in his file other than written evaluations were immaterial. The Board never specifically ruled on this objection at the hearing, although it later issued a statement included in the legal file that these exhibits would remain under seal and were accepted for review by the Board in making its decision.

Teacher offered a number of letters of support from former students as well as two petitions of support purporting to bear the signatures of a large number of current students and/or parents. Board's attorney objected that such materials were irrelevant but we can find no ruling on the offer or the objection in the record before us.

### Board's Findings

At the conclusion of its deliberations, the Board issued the following findings of fact and conclusions of law:

1. Ron Youngman was a permanent teacher as of 3–16–93 at Gasconade County R–1 Middle School.

2. [C.C.] was a 14 year old student as of 3–16–93 at Gasconade County R–1 Middle School attending the class of Ron Youngman.

3. On 3–16–93, at the Gasconade County R–1 Middle School, Ron Youngman approached [C.C.] in the hallways and proceeded to hug, rub the back and kiss the neck of [C.C.].

4. [C.C.] interpreted the acts as a sexual advance or sexual harassment of himself and was offended by those acts, to the extent that he was afraid to return to the classroom of Ron Youngman.

5. On a prior occasion Ron Youngman approached [C.C.] in the Middle School of Gasconade County R–1 and proceeded to hug and kiss [C.C.].

6. On other prior occasions, Ron Youngman has kissed and hugged other students at Gasconade County R–1 Middle School.

7. Other students have reported to school officials being offended by the physical actions of Ron Youngman to his students.

8. Some students have expressed reluctance to report their fear or offensiveness of the physical actions of Ron Youngman.

9. Ron Youngman has been previously advised by the administration of the fear and offensiveness felt by some students of his physical actions toward students.

10. The collective actions of Ron Youngman on 3–16–93 in hugging, rubbing the back of, and kissing [C.C.] were inappropriate actions by a Middle School teacher to a 14 year old student.

11. The collective actions of Ron Youngman on 3–16–93 in hugging, rubbing the back, and kissing [C.C.] were reasonably perceived by the student as actions of sexual harassment.

12. The collective actions of Ron Youngman on 3–16–93 in hugging, rubbing the back, and kissing [C.C.] do not conform to the standards of this community.

13. The actions of Ron Youngman on 3–16–93 in hugging, rubbing the back of, and kissing [C.C.] were not solicited or welcomed by [C.C.].

14. The actions of Ron Youngman toward [C.C.] on 3–16–93 therefore amount to immoral conduct.

15. These collective actions of Ron Youngman toward [C.C.] make Ron Youngman unsuitable to teach and educate other students who may reasonably have a similar fear of the physical actions of Ron Youngman.

16. Because of a presence of fear by other students having been expressed, Ron Youngman is not suitable to teach and educate at the Gasconade County R–1 Middle School.

17. The actions of Ron Youngman are in violation of Section 168.114.1(2), RSMo, and he is therefore subject to termination pursuant to Chapter 168 RSMo.

IT IS THEREFORE the decision of the Gasconade County R–1 School District Board of Education that the contract of Ron Youngman with the Gasconade County R–1 School District is herewith terminated and Ron Youngman is discharged as a permanent teacher therefrom.

*Analysis*

Teacher's contentions on appeal can be readily grouped into two categories: (1) challenges to the Board's findings pertaining to Teacher's alleged physical contacts with students other than C.C. (findings 7–9); and (2) challenges to the Board's interpretation of what constitutes "immoral conduct" within the meaning of § 168.114.1(2) (findings 10–12 and 14–17). Teacher urges the findings in the first category are beyond the scope of the charges served upon him and are unsupported by competent and substantial evidence. As for the latter category, Teacher maintains that the Board has effectively substituted an unconstitutionally vague standard of "community standards" for an equally vague standard of "immoral conduct," improperly relied on a minor's perceptions to determine the appropriate standard of conduct, and arbitrarily and capriciously found him guilty of "immoral conduct" in contravention of ·criteria established in prior cases.

**A.** *Conduct Involving Other Students*

■ As our summary of the evidence suggests, there was not a scintilla of testimony from any witness which would support the Board's findings 7, 8 and 9 that other students had reported being offended by Teacher's physical actions, that students had expressed reluctance to report such fears, and that the administration had previously advised Teacher of the fear and offensiveness students felt as a result of his physical actions. Based on careful scrutiny of the record and the Board's brief, it appears that the genesis of these findings lies in the Board's misplaced reliance on hearsay testimony and a single, five year old hearsay report buried deep within Teacher's "building level" file which was admitted over Teacher's objections. For a number of reasons, we find that findings 7, 8 and 9 are not supported by competent and substantial evidence and cannot serve as the basis for discipline on the charges served upon Teacher.

The only conceivable basis we can find in the record for the Board's finding that "some students" have expressed reluctance to report their fear or offensiveness of Teacher's "physical actions" (finding 8) is the testimony of Denis Fleer, a witness called by Board's attorney in rebuttal. Mr. Fleer was asked by the Board's attorney whether any of his children had "expressed a fear to come forward with what they had seen in his [Teacher's] class." Mr. Fleer said they had. · Board's attorney then asked Mr. Fleer what his daughter had relayed to him and Teacher's counsel objected on the grounds that the question called for hearsay, which was not competent evidence. After it became apparent that any testimony Mr. Fleer would give would be based on hearsay reports from his children, Board's attorney discontinued questioning and the witness was excused.

■ Hearsay evidence is not competent and substantial evidence unless admitted without objection. *Hacienda Enterprises No. 2, Inc. v. Smarr,* 841 S.W.2d 807, 811 (Mo.App.1992); *Mark Twain Homes v. Labor & Indus. Relations,* 616 S.W.2d 145, 147 (Mo.App.1981). In this case, the only hearsay testimony by Mr. Fleer admitted without objection was his testimony that one or more of his children had expressed a reluctance to come forward with "what they had seen in his [Teacher's] class." Thereafter, Teacher objected to questions seeking to elicit hearsay and the questions were never answered. Nothing in the single question and answer elicited without objection suggests that the children's fear and reluctance to come forward pertained to Teacher's hugging and kissing C.C., themselves or any other student, or indeed any "physical actions" of Teacher. Thus, there is no competent and substantial evidence to support finding 8. We therefore deem such finding to be stricken from the record.

■ The only source to which we have been cited for Board's findings 7 and 9 is Exhibit No. 7, Teacher's "building level" [5] file, which was received over Teacher's objection and remains under seal. The exhibit consists of some 78 unnumbered pages. When offered, Teacher objected to admission of any portion of the file other than his written evaluations, which Teacher requested not to be admitted under seal. Teacher ob-

---

5. The "building level" file is a file kept by the school principal for his or her own needs.

jected that the balance of the file was not relevant or material to the charges. The Board apparently had not had a chance to examine the file so the document was received with the understanding that counsel would be advised "a little later" whether the Board considered the exhibit relevant and material. So far as the record reflects, the first time Teacher or his attorney was advised that the exhibit would be considered in the Board's deliberations was when the Board issued its findings.

■ Although it is not dispositive of the issue presented, we note that the objections of Teacher's counsel were well taken and should have been ruled upon prior to the close of the hearing so that Teacher would be on notice of the evidence offered against him. For the most part, the material in the file had nothing whatsoever to do with the charge and should have been excluded. Where evidence is challenged on the ground of relevance and materiality and plainly contains matter that is not relevant or material, the proper procedure would be to require the proponent of the exhibit to identify the portions of the document that are relevant and material and explain why.

The inherent unfairness of failing to follow such a procedure is well illustrated by this case. Having scrutinized the entire 78 pages of Exhibit 7 for any material which conceivably could have given rise to findings 7 and 9, we find a single handwritten, unsigned, two-page report apparently prepared by a former principal approximately 4½ years prior to the hearing. In this report, the writer states that a student, T.H., came into the office and said she was afraid of Teacher. She said he was impatient with her. According to the report, T.H. also said she had seen Teacher rub a male student, D.L., on the back and "caress" his cheek (apparently during class). T.H. is also reported to have said that two other girls had told her they had seen Teacher whisper in D.L.'s ear. T.H. also said that others had seen "similar things" in a class with J.G., another male student. The report then states that the writer told Teacher what T.H. had said. The report concludes, "He

stated he touched students as any other. I said I wasn't here to stop him but wanted him aware. Matter dropped."

Teacher maintains that this document cannot be considered substantial and competent evidence because it is hearsay and because it pertains to matters beyond the scope of the charge Teacher was called upon to defend.

As discussed above, hearsay evidence is not ordinarily deemed substantial and competent evidence unless it is admitted without objection. Here, Teacher objected that the documents comprising Exhibit 7 were irrelevant and immaterial. There was no specific objection that the documents were hearsay. On the other hand, not all of the documents comprising Exhibit 7 would necessarily have been excludable on that basis and Board's attorney never indicated that this document, buried within a host of obviously irrelevant documents, was a document he was relying upon to support the charge. In view of the Board's failure and refusal to require Board's counsel to articulate the relevance of any documents in the massive files, we do not believe Teacher's attorney can be faulted for failure to make a specific objection to this particular document as hearsay. In our view, Teacher's objections were sufficiently specific to preclude acceptance of the documents comprising Exhibit 7 as competent and substantial evidence absent some notice to Teacher of what portions, if any, of the massive files the Board deemed relevant to the filed charges.

Further, even in the absence of a hearsay objection, we fail to see how the single, 4½ year old report described above is relevant to any issue presented for hearing. The report makes no mention of Teacher hugging or kissing any student. Rather, it appears to be a complaint by a female student that Teacher showed favoritism by directing more physical attention to male students in the classroom. There is no indication that the female student feared Teacher would engage in any offensive contact toward her or that the recipients of Teacher's physical contact in the classroom found it offensive.[6] Nor does

---

6.  Indeed, we note that the purported signatures of the male students named by the female student as the objects of Teacher's attention both appear on the petitions tendered in Teacher's support.

it appear that the author of the document so perceived the report, inasmuch as the author stated she "wasn't here to stop him" and that the matter was dropped. If anything, the document tends to support Teacher's position that school authorities knew about and sanctioned his physical demonstrativeness toward students. Accordingly, we find that Board's findings 7 and 9 are not supported by competent and substantial evidence.

### B. *Immoral Conduct*

█ In its brief, Board characterizes the findings set forth in full above as a determination that Teacher made sexual advances toward C.C., thus constituting sexual harassment and "immoral conduct" within the meaning of § 168.114.1(2). Had the Board in fact charged and found Teacher to have made sexual advances toward C.C., we would readily agree that making sexual advances toward a 14 year old child constitutes immoral conduct. But this is not, in our view, either what the Board charged or found.

Mr. Doerhoff, who drafted the charge, never stated that he thought Teacher hugged or kissed C.C. for the purpose of sexual gratification or out of any other depraved motive. In his notes of his discussion of the incident with Teacher on the afternoon of March 18, he specifically noted that no one suggested that there was any sexual motive on Teacher's part. Rather, Mr. Doerhoff's position was that Teacher's actions toward C.C. could be misinterpreted. Mr. Doerhoff obtained no new information between his discussions with Teacher and his delivery of the charge. The charge delivered to Teacher does not mention sex or sexual motive. Thus, it is difficult to understand how the Board can now maintain that the charge should be interpreted to accuse Teacher of making sexual advances toward C.C. or, more importantly, that the charge was sufficient to so apprise Teacher.

Nor can we agree that the findings of the Board represent in any way a determination that Teacher made sexual advances toward C.C. The Board's findings begin with the undisputed facts that Teacher hugged C.C., rubbed his back and kissed him on the neck. Thereafter, the Board's focus (disregarding findings 7–9 for the reasons discussed above) is exclusively on C.C.'s *reaction* to Teacher's conduct—*i.e.,* C.C. *interpreted* the conduct as a sexual advance; C.C. was *offended;* C.C. was *afraid;* C.C. reasonably *perceived* the conduct as "sexual harassment"; Teacher's conduct was *not solicited* or *welcomed* by C.C. (findings 4, 11, 13). Then, based solely on these findings as to C.C.'s (and improperly, other students') reactions to Teacher's conduct, the Board finds that Teacher's actions were "inappropriate," "do not conform to the standards of this community" and "*therefore* amount to immoral conduct." (findings 10, 12, 14; emphasis added). Finally, again relying solely on the wholly unproven fears of students generally, the Board concludes that Teacher is unsuitable to teach and educate students in the district. (findings 15, 16).

The Board made no findings whatsoever as to Teacher's intent or motive for the conduct charged. Rather, the findings are fully consistent with Mr. Doerhoff's position that Teacher's conduct was "inappropriate" because it "could be misinterpreted." Based on our review of the Board's findings and the evidentiary record, we conclude that the Board's omission of any finding that Teacher engaged in the subject conduct for the purpose of sexual gratification or other improper motive was intentional. Had the Board concluded that Teacher was motivated by any sexual intent, there would have been no reason to make any findings as to whether the conduct was offensive to or solicited by C.C. If the Board believed that Teacher hugged and kissed C.C. for the purpose of sexual gratification, it would be irrelevant whether C.C. invited or enjoyed it. Sexual advances toward a child constitute immoral conduct by a Teacher regardless of the child's reaction or invitation. Thus, the fact that the Board focused exclusively on the offensiveness of the conduct to C.C. strongly corroborates our conclusion that the Board accepted Teacher's explanation that his actions were motivated by a sense of caring and concern for C.C. and were an attempt to comfort him.

In this regard, it should also be noted that C.C. himself perceived this to be Teacher's motive at the time of the first incident. Al-

though he perceived the second incident differently, the second incident occurred after C.C. had reported the first incident to another teacher, stating if Teacher ever tried it again, he would do something about it. This warning was never passed on to Teacher. Although C.C. did not know if the warning had been communicated to Teacher, the fact that he had voiced his objection to someone in authority could well justify his viewing the second incident in a different light. Thus, the Board's finding that C.C. reasonably perceived Teacher's actions as "sexual harassment" does not equate to a finding that this was, in fact, Teacher's intent. Rather, based on the findings and conclusions adopted by the Board, it is clear that Board's position is that Teacher's conduct was "immoral" even if his intent was precisely what he said it was— *i.e.*, an expression of caring and concern for the child.

Teacher urges that such reasoning improperly and unconstitutionally employs an admittedly emotionally troubled student's *reactions* as the decisive test of "community standards," which Teacher maintains is itself a concept even more vague than "immoral conduct." Teacher argues that such interpretation of the term "immoral conduct" cannot be reconciled with prior judicial construction of the term or with cases upholding its application to specific facts. Board responds that § 168.114.1(2) and the term "immoral conduct" has been determined not to be unconstitutionally vague in *Ross v. Robb,* 662 S.W.2d 257, 259 (Mo. banc 1983) and *Thompson v. Southwest School Dist.,* 483 F.Supp. 1170 (W.D.Mo.1980), a case also cited and relied upon by Teacher.

▮ In *Thompson,* a teacher suspended and threatened with termination for "immoral conduct" for cohabitating with a man out of wedlock sought to enjoin further termination proceedings claiming, *inter alia,* that

§ 168.114.1(2) was void for vagueness. 483 F.Supp. at 1173, 1178. In addressing this issue, the court acknowledged that due process requires that "laws give persons of ordinary intelligence an opportunity to know what conduct is prohibited so that they will have an opportunity to avoid that type of conduct." *Id.* at 1178. Noting that at least one federal district court had stricken a similar teacher tenure statute on vagueness grounds, the district court in *Thompson* also expressed serious reservations as to the constitutionality of the term "immoral conduct." *Id.* at 1178–79. However, the court found it unnecessary to reach the constitutional issue because, based on its analysis of the statute as a whole, the term "immoral conduct" as used in § 168.114.1(2) was susceptible of a more precise judicial construction which would enable it to avoid the vagueness issue. *Id.* at 1180. Specifically, the court held that the legislature intended to allow dismissal only in instances where a teacher's immoral conduct adversely affected the teacher's performance or would otherwise render the teacher unfit for the performance of his or her duties. *Id.*[7] Finding no evidence that the teacher's cohabitation had rendered her unfit to teach, the court enjoined further proceedings. *Id.* at 1185..

In *Ross v. Robb,* the Missouri Supreme Court likewise found that the vagueness issue could be avoided by adopting the limitation set forth in *Thompson, i.e.,* that the conduct must render the teacher unfit for the performance of his duties. 662 S.W.2d at 259. In *Ross,* the teacher was found to have tacitly encouraged and demonstrated tolerance of explicit and grotesque sexual harassment of a female student, which was held both to constitute "immoral conduct" and to support the Board's determination that the conduct rendered the teacher unfit to teach. *Id.* at 260.

7. Although the court later in its opinion stated that immoral conduct *means* conduct rendering a teacher unfit to teach, 483 F.Supp. at 1181, we do not believe that the court was intending to so define the term, nor do we accept that this would be an appropriate definition. Certainly there are many types of behavior or conduct which could render a teacher unfit to teach but would not comport with common understanding of "im-

moral conduct." In the context of the court's overall analysis, we view the court's requirement that the conduct render the teacher unfit to teach as a limitation, not a definition of the term. Thus, conduct which is immoral is not grounds for discipline *unless* it renders the teacher unfit to teach. *Thompson* does not resolve the more vexing issue of what constitutes immoral conduct.

Although both *Thompson* and *Ross* sharply limit the application of the term "immoral conduct" to conduct rendering the teacher unfit to teach, neither case purports to define what constitutes immoral conduct. Rather, in each instance, this limitation was sufficient on the facts presented to avoid the issue of vagueness. Guided by the principles expressed in *Thompson,* we too find that the overall structure and language employed in the statute provides sufficient guidance to avoid the issue of vagueness.

■■■ We begin with the principle that words employed by the legislature are generally to be given their plain and ordinary meaning. *Metro Auto Auction v. Director of Revenue,* 707 S.W.2d 397, 401 (Mo. banc 1986). In construing a statute, we are to also keep in mind the purposes the legislature intended to accomplish and the evils it intended to cure. *In Interest of A.M.B.,* 738 S.W.2d 128, 130 (Mo.App.1987). The purpose of the Teacher Tenure Act is to provide substantive and procedural safeguards with respect to tenured teachers. *Lindbergh School District v. Syrewicz,* 516 S.W.2d 507, 512 (Mo.App.1974). Statutory grounds for dismissal are to be strictly interpreted to fulfill the legislature's intent that permanent teachers have a measure of certainty and stability in employment without being subjected to arbitrary school board action. *Thompson,* 483 F.Supp. at 1181–82.

According to Webster's New Universal Unabridged Dictionary (2d ed. 1983), the term "immoral" means "not in conformity with accepted principles of right and wrong behavior; contrary to the moral code of the community; wicked; especially not in conformance with accepted standards of proper sexual behavior; unchaste; lewd; licentious; obscene." Each of these definitive terms shares a common element of wrongful intent or conscious disregard of established mores such that the act itself bespeaks or permits a presumption of knowledge of its wrongful character.

■■■ This understanding of the term immoral conduct is also compelled by the principle that a statute is to be construed as constitutional, if at all possible. *Sate ex rel. Union Elec. v. Pub. Serv. Com'n,* 687 S.W.2d 162, 165, (Mo. banc 1985). In *Thompson,* the court found that the Teacher Tenure Act, §§ 168.102–.130, confers upon permanent teachers a protected property interest which cannot be deprived without adequate notice. 483 F.Supp. at 1179. Further, because the grounds for removal are penal in nature, they must be interpreted so as to fully apprise those who are subject to its restrictions as to the prescribed conduct with a reasonable degree of certainty. *Id.* The law must give persons of ordinary intelligence an opportunity to know what conduct is prohibited so that they will have an opportunity to avoid that type of conduct. *Id.*

■■■ The term "immoral conduct" is sufficient to provide the constitutionally required fair warning if, and only if, it is strictly construed to encompass only conduct which permits the inference of a *conscious disregard* of established moral standards. So construed, the consciousness of wrongdoing serves as notice.

■■■ Addressing the concept in a somewhat different context, our supreme court has held that "moral turpitude" means acts which are "contrary to justice, honesty, modesty or good morals, or involving baseness, vileness or depravity" by one who "comprehends the nature and consequences of his conduct." *In re Shunk,* 847 S.W.2d 789, 791 (Mo. banc 1993). In view of the recognized purposes of the Teacher Tenure Act and the constitutional imperatives discussed in *Thompson,* we believe the term "immoral conduct" must be accorded the same meaning. At a minimum, the term "immoral conduct" as used in § 168.114.1(2) contemplates conduct which is sufficiently contrary to justice, honesty, modesty or good morals, or involving baseness, vileness or depravity so as to support the inference that the teacher consciously comprehended the wrongful nature of the conduct.

This interpretation of "immoral conduct" is also consistent with the prior cases upholding termination on this ground. *See e.g., Ross v. Robb, supra; Kimble v. Worth County R–111 Bd. of Educ.,* 669 S.W.2d 949 (Mo.App.1984) (theft); *Gerig v. Board of Educ.,* 841 S.W.2d 731 (Mo.App.1992) (publication and endorse-

ment of student articles containing explicit, crude and tasteless sexual references and promoting or condoning drug use); *Schmidt v. Board of Educ.*, 712 S.W.2d 45 (Mo.App. 1986) (allowing students of opposite sex to share motel room); *Cochran v. Bd. of Educ.*, 815 S.W.2d 55 (Mo.App.1991) (dishonesty; violation of Federal Property Management Regulations); *Lile v. Hancock Place School Dist.*, 701 S.W.2d 500 (Mo.App.1985) (sexual activity with paramour's minor daughters).

The common denominator to be gleaned from these cases is that immoral conduct is conduct which goes beyond a matter of judgment such that the teacher may properly be presumed to have prior notice of its wrongful character and thus may be properly held responsible for his conscious disregard of established moral standards. Immoral conduct is conduct which is always wrong. Just as one can never be accidentally or unwittingly dishonest, immoral conduct requires at least an inference of conscious intent. To hold otherwise would vitiate the legislature's intent to provide stability and certainty in matters of teacher discipline and seriously undermine if not destroy the concept of prior notice that due process requires in teacher termination cases. *See Thompson*, 483 F.Supp. at 1178, 1181–82.

It follows that the Board's determination that Teacher engaged in "immoral conduct" cannot properly be predicated solely on C.C.'s reactions to Teacher's conduct. Experience suggests that individual reactions to the most well-intended displays of affection or comfort vary widely from person to person. It is undisputed that Teacher had no prior notice that C.C. found his physical demonstrativeness offensive or that C.C. interpreted Teacher's actions in the manner that he did. If Teacher's actions were undertaken for the purposes of sexual gratification, he would be guilty of immoral conduct regardless of whether C.C. found it offensive or even solicited it. Conversely, a gesture perfectly innocent or even laudable in intent may nonetheless be misperceived by the recipient. Failure to appreciate the potential for such misperception may well be bad judgment, but it is not, without more, immoral conduct within the meaning of § 168.114.1(2).

As discussed above, the Board made no finding that Teacher had an improper motive. Nor, in the exercise of our authority to weigh the evidence as provided in § 536.140.3, do we find that the evidence presented at the hearing supports a finding that Teacher's actions were motivated by anything other than caring and concern for C.C.'s apparent distress. C.C.'s testimony confirms that there was a valid basis for Teacher's concern. Although C.C. denied that he was crying, he stated that the incident began when Teacher asked him what was wrong, thus indirectly confirming that his distress was manifest. In response to Teacher's inquiry, C.C. confirmed that he was not feeling well, which would naturally cause any Teacher to express feelings of caring and concern. What followed was a clash of two opposite cultures. C.C. comes from a background in which "nobody that's even close to me like relatives or anything would kiss me on the neck." Teacher comes from a background in which such gestures are routine. In hindsight, Teacher may certainly be faulted for his failure to appreciate that these sort of cultural differences exist and that his physical demonstrativeness might be offensive to those with different backgrounds or even misperceived as a sexual advance. On this record, it appears that Teacher's actions were misconstrued by C.C.; they clearly were offensive to him. Yet these subjective reactions, even if they are the product of poor judgment on Teacher's part, cannot transform well-intended conduct into an immoral act.

We find also no evidentiary support for the Board's determination that Teacher's actions did not "conform to the standards of the community." All of the evidence was to the contrary. Neither the principal nor the superintendent were willing to testify that hugging or even kissing a child of middle school age would be immoral in all circumstances. Several teachers testified that physical contact with students had been expressly encouraged. The superintendent testified that he had never issued any policy on the matter aside from his specific instructions to Teacher upon the afternoon of March 18, two days after the incident occurred.

Our determination that the record does not support a determination that Teacher engaged in "immoral conduct" does not mean that the Board or school officials cannot take steps to ensure that such misunderstandings do not occur in the future. The statute provides a procedure for appropriate corrective action whereby individual teachers can be notified of the need to modify undesirable behavior and disciplined for failure to do so. *See* § 168.116.2. Further, in view of the manifest confusion among middle school teachers testifying at the hearing, a clear policy on physical contact between teachers and middle school students would no doubt be well advised. As Mr. Combs testified, children of middle school age are entering into a period of great physical, emotional and sexual change. At a time when children are being regularly admonished to be suspicious of physical contact initiated by adults, the danger that an innocent gesture will be misinterpreted is high. But the teacher termination process is not the appropriate vehicle for establishing school policy. Under the Teacher Tenure Act, teacher termination is justified as a means of enforcing *existing* policy or established moral standards that, by their nature, do not require codification.

For the reasons set forth above, we hold that the evidence in this case does not support a finding that Teacher engaged in "immoral conduct." Although Teacher may have exhibited poor judgment in failing to anticipate that his actions might be offensive to or misinterpreted by C.C., such a lapse in judgment does not constitute "immoral conduct." Teacher testified to his willingness to conform his behavior to whatever policy school officials may adopt. Should he fail to do so, he will clearly be subject to further disciplinary action.

The judgment of the circuit court is reversed and the cause is remanded for entry of an order for Mr. Youngman's reinstatement and for further proceedings consistent with this opinion and § 168.118.4.

CRANE, P.J., and KAROHL, J., concur.