Nancy A. HOWARD, Petitioner–
Respondent,

v.

MISSOURI STATE BOARD OF EDU-
CATION and Springfield R–12 School
District, Respondents–Appellants.

Nos. 20126, 20128.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 7, 1995.

Motion for Rehearing and/or Transfer
to Supreme Court Denied Dec. 28, 1995.

Application to Transfer Denied
Feb. 20, 1996.

---

Jeremiah W. (Jay) Nixon, Attorney General, and Ronald Molteni, Assistant Attorney General, for Appellant Missouri State Board of Education.

Ransom A. Ellis, III and Laura J. Johnson, of Ellis, Ellis & Black, P.C., Springfield, for Appellant School District of Springfield R–12.

Craig A. Smith, Daniel, Clampett, Lilley, Dalton, Powell, & Cunningham, Springfield, for Respondent.

PER CURIAM.

As a result of proceedings brought by Appellant Springfield R–12 School District ("District"), Appellant Missouri State Board of Education ("Board") revoked the teaching certificates of Respondent Nancy A. Howard pursuant to § 168.071, RSMo Supp.1990, then in effect (since repealed and reenacted, *see* § 168.071, RSMo 1994).

Howard sought trial de novo in circuit court as provided by the teacher licensing statute noted above. Previous to trial summary judgment was entered in her favor. That judgment was reversed on appeal and the cause remanded for trial de novo. *Howard v. Missouri State Bd. of Educ.*, 847 S.W.2d 187 (Mo.App.1993). After trial de novo the circuit court reversed the Board's decision, ordering that Howard's teaching certificates "be reinstated."

Where an administrative determination is relevant, appellate courts usually review the decision of the administrative agency. E.g., *Simpson Sheet Metal v. Labor and Indus. Relations Comm'n*, 901 S.W.2d 312, 313 (Mo.App.1995). However, where there is trial de novo in the circuit court, the decision of the trial court is reviewed. *Koehr v. Director of Revenue*, 863 S.W.2d 663, 664 (Mo. App.1993); *Kinder v. Director of Revenue*, 895 S.W.2d 627, 628–29 (Mo.App.1995).

Review is under Rule 73.01. Ordinarily, deference would be given to the trial judge's determination on the credibility of witnesses. Rule 73.01(c)(2). However, that rule would not apply here as no testimony was presented in front of the judge, but the evidence was solely from affidavits, depositions, and other presentations in writing. In this situation, deference to the trial court's assessment of credibility does not apply. *Automobile Club Inter–Ins. Exch. v. Chamberlain*, 839 S.W.2d 378, 381 (Mo.App.1992); *Farmers & Merchants Ins. Co. v. Harris*, 814 S.W.2d 332, 334 (Mo.App.1991). Deference is irrelevant here as there is no factual

dispute and Appellants' two contentions presented are strictly questions of law.

Toward the end of the 1989–90 school year Respondent was one of the teachers of a junior high reading class attended by E., a 15–year–old male student. Before the school term ended, Respondent asked E. to do some yard work for her, to which E. agreed. On those days that E. did the mowing and yard work for Respondent she would allow E. to drive her van to his home when he was finished. E. stated in his affidavit that before the term ended, Respondent began going to E.'s home "regularly after school . . . four or five times a week" and continued "frequently throughout the summer of 1990." These visits typically occurred while E.'s mother was at work and E., his brothers and sister "were the only ones at home."

It was during these visits to E.'s home or neighborhood that some of the conduct alleged by the District and for which charges were preferred against Respondent occurred. E. testified that Respondent told him "on several occasions throughout the summer" that she would not "sleep with" one of his brothers [JRT], but that she "wouldn't mind having sex" with E. or his other brother [GT]. During that summer when Respondent came to E.'s home, she would take E. and his brothers for rides in her van. When alone with Respondent in her van, E. stated that "on several occasions . . . [Respondent] kissed me on the cheek and tried to French kiss me while I was driving. She would rub her hands on my thighs." When E. indicated to Respondent that he wanted her to stop, she would not do so. E. further averred that Respondent would relate "her sexual exploits of the night before," and "would often describe in graphic detail her sexual relations."

Respondent's behavior alleged to be immoral and supported in affidavits submitted to the court included the following:

"[Respondent] approached four [minor] boys . . . and offered to take them to a local park for the purpose of having sexual relations with them;

"[Respondent] approached . . . [the mother] of two of the boys, in [mother's] home, and stated that she was 'horny' and would 'like to fuck your son, but I won't without your permission;'

"[Respondent] told [the same mother] that she had been trying to 'French kiss' one of the young boys;

"[Respondent] told [the boys] that 'she was so sore she couldn't walk' because she had 'screwed four guys the night before, two at a time,' but was 'still horny';

"[Respondent was] observed . . . chasing the neighborhood boys around and 'grabbing at the boys and hanging all over them.' [A mother] heard [Respondent] state to a young boy, 'I bet you can't bend over and lick your own dick';

"[Respondent] approached the twelve-year-old son [of the same mother], and 'dropped her pants . . . and lifted up her blouse in front of him.' [Respondent] then 'stuck out her tongue and showed [one of the boys] a big sore on it . . . she told him that she had "sucked so many dicks" that it made a blister on her tongue. . . .' "

Further evidence relating to Respondent's conduct was submitted to the court by an affidavit of Springfield Police Officer Williams. Williams stated that on August 6, 1990, Respondent pulled into the lot of the Springfield Police Department, blocking his exit, got out of her car, and proceeded to take off her blouse. Naked from the waist up, Williams said that Respondent "began yelling, 'Fuck you, I want you to fuck me!" and began to take off her pants. Officer Williams, with the assistance of "four or five officers" carried Respondent into the Springfield jail "where she was handcuffed and placed in a holding cell." She was later moved to the Marian Center of St. John's Regional Health Center, which provides psychiatric services.

After August 8, 1990, Respondent began making threatening phone calls to the mother of two of the boys who were present during some of Respondent's visits to E., blaming the mother for her troubles. The boys' mother also saw Respondent waiting outside their home. Fearing for their safety, the mother moved from the area and obtained an unlisted telephone number. Early in the fall of 1990, Respondent obtained day passes from the Marian Center and returned

to E.'s house. E. began avoiding Respondent and refused an offer to ride in her van.

A letter, dated August 23, 1990, to a police detective from a psychiatrist, who said that Howard had been a patient of his since January, 1990, stated that when she took the medication he prescribed "she does not demonstrate behavior that is socially inappropriate at all." He determined that the "overriding problem here is one of compliance. She generally has not been particularly compliant in taking her medications."

In Howard's affidavit, dated June 16, 1994, she stated that she:

"[E]xperienced undesirable side effects associated with at least one and perhaps more ... medications, and the side effects I experienced adversely affected my behavior. At times, the undesirable side effects caused me to avoid taking one or more of my medications, thereby resulting in adverse behavior relating to my diagnosed mania or depressive disorder."

The psychiatrist who has treated Howard since September 12, 1990, stated in an affidavit, also dated June 16, 1994:

"[T]he actions of Ms. Howard as alleged to have occurred as referenced in the charges against Ms. Howard were, within a reasonable degree of psychiatric certainty, the direct result of either her mental disorder or the treatment and medication she received for that disorder, and not the result of a lack of morality or intention to commit an immoral act or acts on the part of Ms. Howard."

Section 168.071.1, RSMo, provides that the Board may, among other reasons, "revoke a certificate of license to teach upon satisfactory proof of ... immorality." Respondent's position, accepted by the trial court, is that she "did not engage in 'immorality' in that the evidence before the court established that she was acting under the influence of either a mental illness or medications associated with that illness at the time the acts complained of occurred and lacked intent to commit any immoral act."

■ Each Appellant has two points relied on, essentially raising the same contentions. Both Appellants assert that Respondent's petition should be dismissed because the District was not originally made a party nor timely added to this matter. The remaining point of each Appellant asserts that "immorality," as used in § 168.071 does not require intent.

The review provisions contained in § 168.071.1 govern here, not those contained in §§ 536.100–536.150, RSMo 1994. *See Dorf v. Consolidated School Dist. No. 4,* 739 S.W.2d 751 (Mo.App.1987); Rule 100.01. That section does not set forth who should be made parties or the form of the petition. It does, at least by inference, indicate that the complaining authority, here the District, would be participating. The statute not only refers to "the person making the complaint" but directs that if "the court disaffirms the judgment, then it shall assess the costs of the whole proceedings against the district making the complaint."

In *State ex rel. Cass County v. Dandurand,* 759 S.W.2d 603, 606 (Mo.App.1988) (cited with approval in *Reifschneider v. Public Safety Comm'n,* 776 S.W.2d 1, 3 (Mo. banc 1989)), the court said that in certain circumstances a petition for judicial review "is not jurisdictionally deficient for failure to name all parties who appeared in the proceeding before the administrative body, nor is it necessary that all parties be notified of the filing of the petition within [the applicable time limit]."

*Dandurand* states that there must be notice to a party who has property rights affected by the administrative body, but that this notice does not have to be given within the time limitation for filing the petition. It concludes that such notice is "adequate if the party is made aware of the proceeding in sufficient time to prepare, appear and be heard." 759 S.W.2d at 605.

Here, the petition for review was timely filed, but the District was not named as a party. It was notified of the action shortly after the ten-day limit. Four months later an amended petition naming the District as a party was filed. District thereafter participated in the action on the merits. We conclude, based upon the discussions in *Reifschneider* and *Dandurand,* that the trial court

had jurisdiction upon the filing of the petition for review and proceed to discuss the contention on the merits presented by Appellants.

Board states in its brief that Howard "has acted immorally regardless of intent, and the Board can revoke her teaching certificates." District contends that the trial court erred as § 168.071 does not require "conscious culpability." The Board states that " 'immorality' as it appears in Section 168.071 bears no requirement of intent" and asks this Court to order the trial court to affirm the Board's order. The District asks that the circuit court judgment be reversed because it "erred in holding that intent is an element of immorality under § 168.071."

There are no Missouri cases defining "immorality" as used in § 168.071.1. There are cases having to do with the termination of the indefinite contracts of "permanent" or tenured teachers for "immoral conduct" under § 168.114.1(2), which is part of Missouri's Teacher Tenure Act, §§ 168.102 to 168.130, RSMo. Some of those cases are discussed in *Youngman v. Doerhoff,* 890 S.W.2d 330 (Mo. App.1994), the principal authority relied on by Respondent. In addressing the subject of "immoral conduct" with respect to a tenured teacher, the court there said, at 341:

> "According to Webster's New Universal Unabridged Dictionary (2d ed. 1983), the term 'immoral' means 'not in conformity with accepted principles of right and wrong behavior; contrary to the moral code of the community; wicked; especially not in conformance with accepted standards of proper sexual behavior; unchaste; lewd; licentious; obscene.' Each of these definitive terms shares a common element of wrongful intent or conscious disregard of established mores such that the act itself bespeaks or permits a presumption of knowledge of its wrongful character.
>
> " . . . .
>
> "The term 'immoral conduct' is sufficient to provide the constitutionally required fair warning if, and only if, it is strictly construed to encompass only conduct which permits the inference of a *conscious disregard* of established moral standards. So construed, the consciousness of wrongdoing serves as notice."

Seizing on these remarks in *Youngman,* Respondent argues that she cannot be deprived of her teaching certificates on the ground of immorality because there was not specific evidence of a conscious intent to commit the acts alleged, and there was no allegation that she intended to be immoral or even knew she acted in an immoral manner. The Board notes that there is no express statutory element of intent in either statute and distinguishes *Youngman* on the basis of the nature of the conduct involved. The District simply urges that *Youngman* was "wrongly decided."

We conclude, however, that the purposes served by Missouri's licensing requirements for teachers differ, in some respects, from those served by the Teacher Tenure Act. "The overriding purpose of the Teacher Tenure Act is to 'attain stability, certainty and permanence of employment on the part of those who have shown by educational attainment and by a probationary period their fitness for the important profession of teaching.' " *Selby v. North Callaway Board of Education,* 777 S.W.2d 275, 276 (Mo.App.1989) (quoting *Lopez v. Vance,* 509 S.W.2d 197, 202 (Mo.App.1974)). Put another way, the tenure law "is to protect competent and qualified teachers in the security of their positions." *Hirbe v. Hazelwood School District,* 532 S.W.2d 848, 850 (Mo.App.1975). The purpose of the act "is to establish strictly defined grounds and procedures for removing a permanent teacher" and tenured teachers have been referred to as "beneficiaries" of the act. *Lindbergh School District v. Syrewicz,* 516 S.W.2d 507, 512 (Mo.App. 1974).

On the other hand, the focus of licensing laws, and suspension or revocation provisions included therein, is on protection of the public served by such licensed professionals. *Duncan v. Missouri Board for Architects,* 744 S.W.2d 524, 531 (Mo.App.1988). Cases uniformly reflect this focus with respect to the disciplining of various occupational licenses. *See In re Haggerty,* 661 S.W.2d 8, 10 (Mo. banc 1983) (law license); *Newman v. Melahn,* 817 S.W.2d 588, 590 (Mo.App.1991) (insurance agent's license); *Gaddy v. State Board of Registration for Healing Arts,* 397

S.W.2d 347, 353 (Mo.App.1965) (physician's license).

*Youngman* characterizes the termination provisions of the tenure act as "penal in nature." 890 S.W.2d at 341. "Generally, penal statutes are given strict construction, and doubt should be resolved in favor of the party affected by them." *Seventy–One Sportsmen Club, Inc. v. Director of Revenue,* 707 S.W.2d 805, 808 (Mo.App.1986). License revocation cases tend to reflect that the applicable statutes are not for punishment. *Haggerty,* 661 S.W.2d at 10; *Newman,* 817 S.W.2d at 590. Emphasis is therefore placed on the remedial purpose of the law expressed in terms of the public good.

In this connection, and with respect to construing a professional license revocation statute, it has been said that "[r]eference should be had to the policy adopted by the Legislature in reference to the subject-matter, the object of the statute, and the mischief it strikes at or seeks to prevent, as well as the remedy provided." *State ex rel. Lentine v. State Board of Health,* 334 Mo. 220, 65 S.W.2d 943, 950 (1933). *Lentine* dealt with revocation of a physician's license and is cited by the *Duncan* and *Gaddy* cases mentioned above. In *Lentine,* the court went on to determine that the policy of the licensing statute was for the protection of the public in securing skilled practitioners "of good moral character and honorable and reputable in professional conduct." *Id.* Prior authority was rejected which had indicated strict construction more favorable to the practitioner. *See also Younge v. State Board of Registration for the Healing Arts,* 451 S.W.2d 346, 349 (Mo.1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 910 (1970) (reaffirming that physician license revocation law was for the protection of the public and not penal in nature).

■ Nonetheless, to whatever extent a comparison to *Youngman* is appropriate, we have carefully made such comparison. We have determined that *Youngman,* and the cases it cites, demonstrate striking differences from the case now before this Court. Accordingly, we are unable to conclude that grossly offensive and inherently harmful sexual conduct by a teacher, practiced upon school-aged children, must be shown to be actually contrived and intended as a breach of ordinary morality before the state can

withdraw the privilege of a license from the teacher.

In *Youngman,* the tenured teacher was charged under the provisions of § 168.114, RSMo 1986, with "immoral conduct" for purposes of seeking the termination of the teacher's indefinite contract. Specifically, the accusation was the male teacher had approached a 14–year–old male student at school, hugged him, rubbed his back and kissed the student twice on the neck. Importantly, there were numerous special circumstances that indicated the incident was not sexual in nature, and the matter was not viewed as one of sexual misconduct at all.

The student in *Youngman* had special behavioral problems, and was seen "teary-eyed" by the teacher who offered a hug and encouragement in a brief encounter which apparently included the touching and kissing noted. The teacher, with long experience at the school, was known to be physically demonstrative, and there was evidence other teachers also had occasional physical contact with students and that the faculty had in fact been encouraged to extend comforting gestures. However, there had never been any guidelines given as to what kind of contact would be acceptable, and officials could not say that hugging or even kissing a child of middle school age would be unacceptable in all circumstances.

Also in *Youngman* there was no allegation that there was any purpose of sexual gratification, no finding to this effect was made by the school board, and the case on appeal was not treated as one of sexual misconduct. Rather, the evidence was noted as supporting a finding that the teacher's acts were motivated only by care and concern for the student's apparent distress. 890 S.W.2d at 342. The teacher came from a family in which hugging and kissing were very common. The student, on the other hand, indicated a background in which even close relatives would not kiss on the neck. Thus, the student's expression of being offended and his interpretation of the contact as being a sexual advance became the focus of the inquiry, and the apparent basis for the school board's determination that the teacher had engaged in immoral conduct regardless of the teacher's motivation and the lack of any objective basis for saying the act was immoral.

It is therefore significant that *Youngman* involved conduct which, while reflecting poor judgment, was never said or found to be so outside of acceptable behavior that it was plainly immoral. What the case determined was that " 'immoral conduct' cannot properly be predicated solely on [Student's] reactions to Teacher's conduct." *Id.* The court therefore looked to other rules by which to measure the conduct, and it was in that context that the statements in *Youngman* on which Respondent relies were made.

In the present case, the teacher's conduct was patently immoral. The persons served and protected by the teacher licensing law are the students of the communities in which licensed teachers are employed. To condone the teacher's conduct in this case would thwart the protections to which these children are entitled. We hold that, given the facts of the present case, and for purposes of § 168.071.1, there was no necessity to prove intent in order to revoke Respondent's teaching licenses, there being "satisfactory proof of . . . immorality."

The trial court erred as a matter of law in concluding, under the particular facts of this case, that Respondent could not be engaged in immorality. Respondent's actions also had an unfortunate but unquestionable connection with her career as a teacher. Therefore, the judgment is reversed and the Board's revocation of Respondent's licenses is reinstated.

SHRUM, C.J., and PARRISH, J., concur.

PREWITT, P.J., dissents in separate opinion.

PREWITT, Presiding Judge, dissenting.

I respectfully dissent.

Before Appellant State Board of Education made a decision, Appellant Springfield R–12 School District and Respondent entered into a stipulation, including the following:

11. District and Howard recognize that the State Board of Education has the authority, pursuant to § 168.071, R.S.Mo., to revoke or suspend Howard's certificate of license to teach. District would not oppose the imposition of a suspension of Howard's certificate of license to teach for a period of not less than six (6) months. The decision as to the length of the suspension beyond that point, and the conditions for the lifting of such suspension, shall be in the discretion of the State Board of Education.

12. If a hearing were to take place, Howard would present evidence in her defense tending to support the following:

a. That on August 6, 1990, and for at least eight months preceding August 6, 1990, Howard was under the care, treatment, and advice of Dr. James E. Bright, 1965 South Fremont Avenue, Suite 2100, Springfield, Missouri ("Bright"), a psychiatrist at all times relevant to this stipulation to practice psychiatry in the State of Missouri, for depression and mania;

b. That during the course of her treatment by Bright, and in the above described period, she was prescribed the following medications to control her condition: Aventyl, Artane, Stelazine, Prolixin, Wellbutrin, Anafranil, Limbitrol, and Haldol;

c. That her general physician, Dr. Don Menchetti, had prescribed, among other medications, Prozac to treat her depressive symptoms in December, 1989;

d. That Howard experienced undesirable side effects associated with one or more of these medications, and that the undesirable side effects either:

(1) Caused aberrant behavior in Howard, or

(2) Caused Howard to avoid taking one or more of these medications thereby resulting in aberrant behavior related to her mania and/or depressive disorder;

e. Any aberrant behavior exhibited by Howard was a result of her mental disorder or its treatment, and not attributable to a lack of morality or intent to commit immoral acts;

f. That since September 12, 1990, Howard has been under the care, treatment, and advice for her mental condition of Dr. Laird E. Jones, 1740 South Glenstone Avenue, Suit IJ, Springfield, Missouri ("Jones"), a psychiatrist at all times relevant to the stipulation herein licensed to practice psychiatry in the State of Missouri;

g. That during the course of her treatment by Jones, and in the period subse-

quent to September 12, 1990 and continuing to the date of this stipulation, Howard has been treated with Lithium, among other medications, to regulate her condition and symptoms, and that Howard has demonstrated improvement with respect to her mental disorder;

h. That Jones expects Howard's condition to continue to improve, and that he believes that Howard will continue to show improvement with respect to her condition, allowing her to resume normal duties and responsibilities in a classroom setting, and preventing a reoccurrence of any aberrant behavior patterns; and

i. That Jones believes that Howard will continue to take her prescribed medication, and has no reason to believe that Howard will willfully or negligently fail to take her prescribed medication.

13. Howard and the District agree that a suspension as described above would be in the best interests of Howard, District, DESE [Department of Elementary and Secondary Education], and the students and children of the State of Missouri, and that Howard will be afforded a full opportunity to have the suspension lifted by the State Board of Education upon presentation by Howard, her treating physicians, and others of competent evidence demonstrating that she is capable of resuming full classroom duties and responsibilities as reasonably required by the State Board of Education.

Respondent's conduct was so outlandish as to indicate irrational and unintended acts on her part. Appellants do not contend otherwise. Whether from these facts intent could be found or inferred is not raised by Appellants and thus not before this Court. Nor does either Appellant contend that the acts with which Howard was charged were done with conscious intent or conscious disregard of established moral standards.

As the majority opinion stated, there are apparently no cases in Missouri defining "immorality" in Section 168.071.1. There are cases having to do with the termination of tenured teachers for "immoral conduct" under Section 168.114.1(2) RSMo 1994. Many of those cases are extensively, and I believe correctly, discussed in *Youngman v. Doerhoff*, 890 S.W.2d 330 (Mo.App.1994). The

Court in *Youngman* concluded that: "Just as one can never be accidentally or unwittingly dishonest, immoral conduct requires at least an inference of conscious intent." *Id.* at 342.

Both Appellants assert that to follow *Youngman* would ignore how Howard's conduct affected the students, and potential harm to future students, which might be the same regardless of her intent. However true that argument might be under certain circumstances, here we are limited to what the legislature has required and the Board acted upon, that is, conduct constituting "immorality."

Neither Appellant has satisfactorily explained to me how you can be immoral without any intent to do so. *Youngman* is correct and its logic and analysis should apply here. I believe the trial judge correctly ruled and would affirm.